EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LAWYERS' COMMITTEE FOR CIVIL RIGHTS and NATIONAL WOMEN'S LAW CENTER, | ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | Civ. A. No. 18-0645 (EGS) |
| OFFICE OF MANAGEMENT AND BUDGET, | ) ) ) ) | |
| *Defendant*. | ) ) | |

**THIRD DECLARATION OF HEATHER V. WALSH**

I, Heather V. Walsh, make the following declaration based on personal knowledge and information provided to me in my official capacity:

1. The purpose of this declaration is to further clarify and explain the application of FOIA Exemption 5 to the documents that the Office of Management and Budget (OMB) produced in response to Plaintiffs' FOIA request. Specifically, this declaration further details how release of the deliberative information withheld in this case would foreseeably result in two broad types of harm. First, it would chill candid discussions within OMB and with other agencies. Second, it would cause public confusion. I explain below in further detail how release of specific documents, grouped into categories, would result in the aforementioned harms.

2. This Third Declaration supplements the earlier declarations I provided in this case dated September 18, 2019 ("First Walsh Declaration") and November 8, 2019 ("Second Walsh Declaration").

# BACKGROUND

3.  As I stated in paragraphs 11 and 12 of the First Walsh Declaration, the ultimate decision that was the subject of all of the deliberations described in the withheld information at issue was made under authority delegated to OMB by the Paperwork Reduction Act, concerning the approval of collections of information by the federal government. In this case, the collection of information under consideration was the Equal Employment Opportunity Commission's (EEOC) pay-data collection for employers using the Commission's Employer Information Report (EEO-1). This decision was completed on August 29, 2017, when OMB's Office of Information and Regulatory Affairs (OIRA) sent a memorandum to the EEOC issuing a review and immediate stay ("review and stay memorandum") of part of OIRA's previous approval of the EEO-1 collection, issued on September 29, 2016. "EEO-1 Form; Review and Stay" OMB Memorandum, August 29, 2017.[1] OMB issued this policy decision "[a]fter careful consideration and consultation with the [EEOC]." *Id.* As further stated in the memorandum, OMB followed the procedures authorized in the Paperwork Reduction Act's regulations at 5 CFR §§ 1320.10(f) and (g) to issue the agency's decision (i.e., OMB's "review and stay authorities").

4.  All of the deliberations that OMB seeks to withhold are pre-decisional because all of the information withheld pre-dated OMB's final decision on August 29, 2017.

5.  Release of those deliberations would foreseeably harm OMB's interests, in two ways.

# HARM TO CANDID AND FRANK DISCUSSIONS

6.  The first type of harm would be diminishment of the level of candor that OMB staff and other agencies' staff exhibit when they are participating in deliberations, the result of which would be to seriously weaken OMB's decision-making process.

---

[1] *Available at* https://www.reginfo.gov/public/jsp/Utilities/Review_and_Stay_Memo_for_EEOC.pdf.

7.  All of the withheld material at issue here can be categorized as falling into three phases of deliberation: (1) an initial high-level strategic decision among Executive Branch officials whether to begin in earnest, the consideration of issuing a review-and-stay memorandum; (2) OMB's coordination with the EEOC, culminating in EEOC's petition for OMB to issue a review-and-stay memorandum; and (3) OMB's drafting and ultimate execution of the review-and-stay memorandum itself. The harms resulting from release of the materials in each phase are distinct, as explained below.

8.  The first phase (an initial high-level strategic decision among Executive Branch officials whether to begin in earnest, the consideration of issuing a review-and-stay memorandum) concluded on May 2, 2017, and is the subject of OMB's withholdings in the documents listed in OMB's *Vaughn* index as entries 1-7, 10, 34-38, 44, 47, 53-54, 62-63, 67, 68, 71, 73-75, 78, 80-81, and 83-86. *See* Second Walsh Declaration, Appendix C (the documents listed as entries 8-9, 11-16, 24-33, 39, 45-46, 55-57, 59, and 62 have no withholdings of responsive, deliberative information therefore are not currently in dispute)[2]. Disclosure of the withheld information in these documents would harm deliberative processes pursuant to OMB's authority under the Paperwork Reduction Act. 44 U.S.C. §§ 3501–3521. The willingness of agency staff to offer immediate impressions and contrary arguments about matters before the government is a direct product of their awareness of, and confidence in, the protection that the deliberative process privilege provides. Having reviewed the withheld records, I am certain that if any of the deliberative information at issue were to be disclosed, ongoing and future decisions about

---

[2] One listed record OMB produced in part as containing withheld deliberative information, item no. 79, titled "RE: Revised EEOC Supporting Statement for ADEA PRA Waiver (3046-0042 )" concerns a separate EEOC paperwork approval matter and is therefore not responsive to any of the Plaintiffs' FOIA requests.

approval of information collections by OMB under the Paperwork Reduction Act (which are frequent[3]) would suffer from decreased willingness of agency staff to offer frank opinions supporting or opposing such approvals during the course of future deliberations.

9. For example, entry nos. 1-7, 47, 53-54, 73-74, 83 and 85 contain strategic advice about initiating a deliberation about the EEO-1 form, as well as arguments regarding particular policy outcomes relating to the form. The release of such information would expose that advice and those arguments, as well as deliberative procedural aspects of this early, high-level decision-making process, to public scrutiny. As a result, in the future, OMB officials would less willing to participate, and less candid in presenting arguments in preliminary high-level strategy decisions, and OMB's decision-making would seriously suffer as a result.

10. Additionally, entry nos. 14, 15, 34, 35, 37, 38, 62, 63, 75, 78, and 84 concern the creation and editing of broadly deliberative materials to be shared in a March 2, 2017, meeting, in which the Executive Branch decided to begin in earnest the consideration of issuing a review-and-stay memorandum. The release of these deliberative materials would expose both the drafting process for these materials and the deliberations in the meeting. And it would prompt OMB staff to be less candid in revising deliberative materials for meetings, or even to not provide any deliberative materials for meetings at all. Either would have the result of seriously harming OMB's ability to function, let alone succeed in performing its statutory functions.

11. The second phase (coordination between EEOC and OMB, which overlapped with the first phase) culminated in July 14, 2017, when EEOC submitted a petition to OMB asking that

---

[3] Over 1,000 information collections are currently under Paperwork Reduction Act review before OMB. *See* OMB OIRA PRA Dashboard, RegInfo.gov, *available at* https://www.reginfo.gov/public/jsp/PRA/praDashboard.myjsp (last accessed February 13, 2021).

the agency issue a stay of the EEO-1 collection. This coordination is protected by OMB's withholdings in the documents listed in the *Vaughn* index as entry nos. 17-21, 22, 23, 34-35, 40-42, 52-54, 69 and 76-77. Frank and open discussions between OMB and other parts of the Executive Branch are the lifeblood of OMB's unique role in the Federal Government. The frankness and openness of such interagency communications permit OMB to assess and make recommendations on policy matters, one of its central functions within the Executive Branch. OMB is involved in the consideration of policy issues covering a wide range of subjects (e.g., environmental protection, medical care, housing, transportation). On a daily basis, OMB staff discuss policy issues (by telephone, in meetings and via email) with their counterparts in other Federal agencies and with officials and staff in the Executive Office of the President (EOP). The materials being withheld are records of such interactions and are similar to those generated every day on scores of issues by OMB staff. OMB policy officials rely on their staffs to gather such comments and observations from other Executive Branch agencies to brief decision makers on what they have learned and what course of action they recommend. The internal OMB, internal EOP, and interagency discussions, advice and recommendations, such as those contained in the withheld and redacted documents, are vital to informed decision-making by Executive Branch officials.

12. For example, entry nos. 17-21, 53-54, and 73-74 contain the EEOC's detailed analysis about the legal authorities governing OMB's ability to issue a review-and-stay memorandum, prepared in support of EEOC's July 14, 2017, petition to OMB, as well as summaries of that analysis in cover emails. EEOC presented these documents to OMB on July 14, 2017. Were OMB to be required to release the information in these records, the representatives of every Executive Branch agency, who now routinely provide candid advice to OMB such as calling for

the Administration to initiate consideration of major policies, would necessarily hesitate to provide or self-censor their communications to OMB out of concern that the views they offered would face public scrutiny. This would result in fewer options being considered and fewer views being heard on a whole spectrum of deliberations before OMB.

13. Additionally, entry nos. 22, 23 76, and 77 contain follow-up inquiries by participants in the previously-mentioned May 2nd, 2020, meeting about the opinions of other officials, as well as advice regarding the decision-making process and particular policy outcomes. The release of such information would expose those opinions to public scrutiny and would foreseeably inhibit similar officials from being candid with OMB in the future.

14. Similarly, entry nos. 40-42 and 69 contain substantive discussions between EEOC and OMB officials recommending a particular decision outcome concerning the EEO-1 policy and then internal deliberations among OMB officials regarding the appropriateness of immediate actions in response to the earlier recommendations. As noted above, disclosure of this information would seriously inhibit other agencies' willingness to communicate with OMB, which would seriously hamper one of OMB's core functions in the Executive Branch, which is to coordinate among the Departments and agencies.

15. The third phase (preparation and issuance of the review-and-stay memorandum) culminated in August 29, 2017, and is the subject of OMB's withholdings in the documents listed in the *Vaughn* index as items 43, 48-52, 58, 60-61, 64-66, 70, 72. Disclosing such information—the initiation, timing, scope, participants, drafting, and publication of decisions—would lead OMB staff to withhold their candid opinions concerning these types of decisions knowing that their internal deliberative comments would be subject to public scrutiny.

16. For example, entry nos. 43, 48, 49, 50-52, 60-61, 64-66, 70, and 72 concerned the creating and editing by various staff of draft copies of what would become the review and stay memorandum that was ultimately finalized. The publishing of these unfinished drafts would disclose the changes that were suggested by specific staff, and would also expose the drafting process as a whole, which would likely diminish the candor that drafters would incorporate into their comments.

## HARM OF PUBLIC CONFUSION

17. The second type of harm that would foreseeably result from disclosure of the withheld material at issue in this case would be public confusion. In particular, release of the reasoning shared among staff supporting OMB's decision to issue the review-and-stay memorandum, but which was not ultimately the reasoning that was presented in the decision, would likely confuse the public as to the reasoning underlying the decision.

18. For example, as stated previously, the documents listed in the *Vaughn* index as entry nos. 43, 48, 49, 50-52, 60-61, 64-66, 70, and 72 concerned the creating and editing by various staff of draft copies of what would become the review and stay memorandum that was ultimately finalized. During the course of this drafting process, these records include arguments for and against inclusion of text into the draft document. Though one or another part of the draft memorandum may have changed after a particular argument was made, the release of those comments and edits would be likely to create incorrect impressions in the public about the intentions behind this record, decreasing the certainty the public would have in interpreting it.

19. Another form of confusion resulting from release is public confusion regarding which document is the final version. For example, entry nos. 48-51 and 70, are "clean" draft versions of the review-and-stay memos that do not have visible edits, comments, or "draft" labels. If

released, they could be easily confused for final agency documents, diminishing the public's certainty in the veracity of records purporting to be OMB's actual policy document enacting this decision.

20.     In accordance with 28 U.S.C. § 1746, I hereby declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that the accompanying *Vaughn* index and exhibits are true and correct.

Executed in Washington, District of Columbia, this 17th day of February, 2021.

Heather V. Walsh
Deputy General Counsel
Office of General Counsel
Office of Management and Budget